

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LESLIE, ERIC DANIEL, JAVY JUNIOR, )
and JOSELYN DELGADO, minors, by )
their parents and next friend, Erika Delgado; )
ANDIE, LIZA, MARIBEL, AND MABEL )
GARCIA, minors, by their parent and next )
friend, Maria Garcia; DEONTE, DANIELLE, )
DANIEL, DINAH, AND DEANNA McFADDEN, )
minors, by their parent and next friend, )
Tracy McFadden; KAREN, RODOLFO AND )
KIARA TAPIA, minors, by their parent and )
next friend, Marielena Montoya, )
 )
              Plaintiffs, )
 )   No.   05 C 0760
v. )
 )   Judge Robert W. Gettleman
BOARD OF EDUCATION FOR )
ILLINOIS SCHOOL DISTRICT U-46, )
 )
             Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, minority and limited English proficient ("LEP") students in the Illinois School District U-46 ("District"), have filed a four-count putative class action against defendant Board of Education for the District ("Board"). Plaintiffs' first amended complaint[1] alleges that LEP students are suffering from the District's failure to take "appropriate action" to eliminate language barriers, in violation of the Equal Education Opportunity Act of 1974 ("EEOA"), 20 U.S.C. § 1701, et seq. (Count I). Plaintiffs also allege that Hispanic, African-American, Hispanic

---

[1] At a status hearing held on April 12, 2005, the court instructed plaintiffs to attach their proposed first amended complaint to their response to defendant's motion to dismiss. Plaintiffs did so, but also filed the amended complaint separately. The court grants plaintiffs leave to file their amended complaint instanter.

LEP, and non-Hispanic LEP students in the District are currently enduring discriminatory burdens and diminished educational benefits not suffered in the same proportion by white students, in violation of the Fourteenth Amendment to the Constitution (Count II), the Equal Protection Clause of the Illinois Constitution (Count III), and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(a)(1) (Count IV).

Defendant has filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that plaintiffs lack standing and fail to state a claim. For the reasons stated below, defendant's motion to dismiss is denied.

## FACTS[2]

Plaintiffs' amended complaint is lengthy[3] and includes detailed factual allegations, historical information, and statistics. The following is a summary of the facts relevant only to the motion to dismiss.

Plaintiffs are Hispanic and African-American parents and their children who are K through 12 students at schools in the District. Some of the plaintiffs receive LEP services. At least two of the plaintiffs receive special education services, and one also receives LEP services. Defendant District is an Illinois school district operating in the Cook, DuPage, and Kane Counties, and the communities of Bartlett, Carol Stream, Elgin, Hanover Park, Hoffman Estates,

---

[2] The facts recited herein are those alleged in the complaint which, for purposes of this Rule 12(b)(6) motion, the court accepts as true. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996).

[3] Indeed, the amended complaint is unnecessarily lengthy and argumentative. Defendant does not, however, attack the pleading as violating the requirement of Fed. R. Civ. P. 8(a) of "a short and plain statement of the claim," but instead, as discussed below, engages in a refutation of the many facts and issues detailed by plaintiffs.

2

Schaumburg, South Elgin, St. Charles, Streamwood, Wayne, and West Chicago. There are seven members on the Board of Education for the District. There are no Hispanic board members, and one African-American board member.

During the 2003-2004 school year the District had an enrollment of approximately 38,285 students in 51 schools. Of the students, approximately 49.3% were white, 36.3% were Hispanic, 7.3% were African-American, and 7.0% were Asian or Pacific Islander. 34.4% of all students were low income, and 24.6%, or nearly 10,000 students, were enrolled in LEP services. According to a bilingual services audit completed for the District by Dr. M Beatriz Arias and released on March 21, 2005 ("Audit"), the number of English Language Learners ("ELL")[4] in the District has increased at an annual rate of growth of 22% since 1991. Plaintiffs assert that 13 of the 40 elementary schools were racially identifiable during the 2003-2004 school year as white, and 15 were racially identifiable as minority. One of the 8 middle schools was identifiably white, and three were identifiably minority.

In the early 1990s the District was selected for a proactive compliance review by the U.S. Department of Education's Office of Civil Rights ("OCR"). OCR conducted an investigation and required the District to modify its LEP services. OCR released the District from its review in 2003. In approximately 2000 the Illinois State Board of Education ("ISBE") notified the District that it was not appropriately referring, identifying, and providing LEP services to special education students.

---

[4]ELL programs in the District are primarily bilingual programs, but some also contain English as a Second Language components.

In 2000 the voters in the District approved a referendum for school construction. The District implemented a new redistricting plan ("Redistricting Plan"), effective at the start of the 2004-2005 school year. The Redistricting Plan consisted of: (1) redefined attendance boundaries; (2) closing two elementary schools, Woodland Heights and Illinois Park Elementary School ("Illinois Park"); (3) opening three elementary schools in new buildings; and (4) opening a new middle school. According to plaintiffs, all of the new schools were built in "majority" or "predominately" white neighborhoods. School additions were constructed at schools in minority neighborhoods, but there is still insufficient capacity in minority neighborhood schools.

Prior to the Redistricting Plan the District retained Gann-McKidden Demographic Consulting ("Gann-McKidden") to conduct a demography study of U-46. Plaintiffs allege that the District instructed Gann-McKidden not to review racial and ethnic information in conjunction with the demographic analysis, despite information from the District's counsel that race and ethnicity were legitimate and permissible facts to review in preparation for redistricting. In January 2004, Gann-McKidden released a demographic report ("Demographic Report"), a new attendance boundary map, and the recommendation to close two elementary schools, Woodland Heights and Century Oaks. The Demographic Report and proposals were presented to the Board.

Approximately two weeks before adopting the Redistricting Plan in March 2004, the Board substituted for school closure Illinois Park, a school with a predominantly minority population and a K through 6 LEP program, and took Century Oaks, a school with a large white student population, off the closure list. By March 15, 2004, the proposed boundaries and the Redistricting Plan were "rushed" through the Enrollment and Facilities Committee, the Citizens Advisory Committee ("CAC"), "perfunctory" public hearings, and Board adoption and approval.

4

Plaintiffs assert that during the development and approval process of the Redistricting Plan, the Board ignored protests and concerns from the community, including several officials from the City of Elgin, the editorial boards of two newspapers, the teachers' union for U-46, and several members of the CAC.

According to plaintiffs, the opening of the three new elementary schools combined with the enforcement of a strict neighborhood attendance boundary assignment system permitted "only students living in white neighborhoods to almost exclusively reap the benefits of the new construction." Plaintiffs also assert that the Board was unconcerned that the Redistricting Plan increased the degree of racially identifiable schools. According to plaintiffs the Redistricting Plan increases the likelihood that one or more of the District schools on the ISBE watch or warning lists will continue not to make the required annual yearly progress under the No Child Left Behind Act, and that the District may opt to close these failing schools rather than risk losing federal funding.

Plaintiffs admit that the Redistricting Plan reduces the busing of minority and Hispanic LEP students, but assert that many students are still bused, in part because there is insufficient capacity in schools in minority neighborhoods. The closure of Illinois Park and Woodland Heights, two schools with LEP services, increased crowding of LEP programs in minority neighborhoods, which exacerbated transportation and placement instability problems. Plaintiffs allege on information and belief that approximately 50% of LEP students in the District are transported out of their neighborhood schools. Seven of the named plaintiffs attended Illinois Park during the 2003-2004 school year. Six of the seven former Illinois Park students received LEP services and are now transported out of their neighborhoods to other schools. One plaintiff

5

would have started at Illinois Park this year, but attended Kindergarten at a school outside her neighborhood. One family of Hispanic plaintiff siblings all receive LEP services, and are currently split between three schools, none of which is in the family's neighborhood. Another family of Hispanic plaintiff siblings all receive LEP services and are split between two schools, neither of which is in the family's neighborhood. At least one of the named plaintiffs has been assigned to three different elementary schools.

In addition to shouldering unequal transportation burdens and suffering from school assignment instability, plaintiffs allege that LEP students receive deficient and discriminatory services. Hispanic LEP students are impermissibly segregated from regular education students for all instruction rather than for specific educational subjects and purposes only, and are denied proper access to special education referrals, reviews and services. Defendant also fails to provide adequate and timely special education services to LEP students. Plaintiffs allege that these deficiencies cause "educational harms to students and interfere[] with the LEP students' ability to participate in all of the District's educational programs."

In the summer of 2004, counsel for the named plaintiffs began settlement discussions with the District's counsel. After months of the negotiations, the parties reached a tentative agreement. At the eleventh hour, however, the District chose not to enter a settlement agreement and announced its own efforts to revise the Redistricting Plan. According to plaintiffs, the District now says it will permit voluntary transfers for low-income students form schools with high utilization rates to schools with lower utilization rates. Essentially, minority students will be able to transfer out of their neighborhood schools to white neighborhoods schools.

6

## STANDARD

Plaintiff filed a sur-reply arguing that the defendant improperly appended materials outside the amended complaint to defendant's reply in support of the motion to dismiss. Defendant attached four documents to its reply: (1) school-by-school enrollment statistics for the 2003-2004 and (2) 2004-2005 school year; (3) a map of the district's neighborhood attendance areas; (4) and an undated Voluntary Compliance Agreement from OCR. "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993). Plaintiffs reference 2003-2004 enrollment statistics, an attendance boundary map, and a document from OCR in their amended complaint. It is not clear that the documents attached to defendant's reply correspond exactly to the documents referenced in the amended complaint.

"If, on a motion...to dismiss for failure...to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment, and disposed of under Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b). In the instant case, the documents appended by defendant do not appear determinative of the instant motion. In addition, neither party asks the court to covert the motion to dismiss to one for summary judgment, and defendant suggests that the court could "elect not 'to accept' the attachments" to the reply. The court elects not to consider any of the documents, and decides the motion under the standards of Rule 12(b)(6). See, e.g., Bingham v. CNA Financial Corp., 2004 WL 2390093, at *1 (N.D. Ill. Oct. 25, 2004)(disregarding documents to

avoid any concern that defendant's motion must be considered a motion for summary judgment).

## DISCUSSION

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. Gibson v. Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990). Federal notice pleading requires only that the plaintiff "set out in her complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim." Scott v. City of Chicago, 195 F.3d 950, 951 (7th Cir. 1999). When ruling on a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Szumny v. Am. Gen. Fin., Inc., 246 F.3d 1065, 1067 (7th Cir. 2001).

### I. Standing

Defendant argues that none of the named plaintiffs have standing because they fail to allege an injury in fact. For the reasons discussed below, much of defendant's standing argument is premised on a misreading and over-simplification of plaintiffs' claims and allegations.

To establish standing, a plaintiff must show: (1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to the defendant's actions; and (3) that a favorable decision is likely to redress the injury. Tobin for Governor v. Ill. State Bd. of Elections, 268 F.3d 517, 527-28 (7th Cir. 2001), cert. denied, 535 U.S. 929 (2002) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Sierakowski v. Ryan, 223 F.3d 440, 442-43 (7th Cir. 2000). Abstract injury is not enough to establish injury in fact; the plaintiff must

establish that he has sustained or is immediately in danger of sustaining some direct injury. See City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1993); Tobin, 268 F.3d at 527-28.

In a putative class action each named plaintiff must allege an injury in fact. See Gratz v. Bollinger, 539 U.S. 244, 289 (2003) (the fact that a "suit may be a class action...adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent.'")(citations omitted); Payton v. County of Kane, 308 F.3d 673, 683 (7th Cir. 2002) ("Standing cannot be acquired through the back door of a class action.") (citing Allee v. Medrano, 416 U.S. 802, 828-29 (1974) (Burger, C.J., dissenting)).

In the instant case, defendant attacks plaintiffs' pleadings primarily on the first prong, requiring injury in fact, but its challenge is unsuccessful. The Supreme Court held in Lujan, "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" 504 U.S. 555, 561 (1992). Despite defendant's vociferous arguments to the contrary, plaintiffs have met their burden to allege injury in fact under the liberal standard of federal notice pleading.

In broad terms, plaintiffs allege that they are minority students in the District who "are and will be adversely affected by the actions of [defendant]," including defendant's "failure to provide equal educational opportunities and failure to provide a school system free of discrimination." In particular, plaintiffs claim that they suffer from disproportionate transportation burdens placed on minority students, flawed LEP programs, too few schools in

9

minority neighborhoods, discrimination in the provision of special education services, a lack of stability in school placements, and a discriminatory decision-making process that resulted in the Redistricting Plan closing neighborhood schools in minority areas in favor of schools in white neighborhoods. The amended complaint alleges that each of the sixteen named plaintiffs have suffered one or more of these injuries. Indeed, even defendant, while disparaging plaintiffs' pleadings, admits in a footnote in its reply brief that plaintiffs have alleged several types of injuries.

In an effort to escape the express and sufficient allegations of the amended complaint, defendant attacks plaintiffs' pleading from several, ultimately unsuccessful angles. First, defendant repeatedly construes plaintiffs' claims unduly narrowly, often as concerning "racially identifiable" or "segregated" schools only, virtually disregarding plaintiffs' myriad allegations regarding other injuries. Second, defendant incorrectly suggests that the allegations in the instant case are analogous to allegations of purely speculative injuries. See Reid L. v. Illinois State Bd. of Educ, 358 F.3d 511, 515 (7th Cir. 2004) (holding students lacked standing to enjoin proposed new rules on teacher certification). Although the amended complaint here includes allegations regarding speculative harms, such as the future closure of schools in minority neighborhoods, these are in addition to allegations of concrete injuries and therefore distinguishable from purely speculative allegations of harm found lacking in cases such as Reid L. Third, defendant argues that plaintiffs' allegations are contradictory, but defendant fails to appreciate that plaintiffs allege that they were injured by multiple types of unlawful conduct by defendant. For example, plaintiffs allege that while some minority students are subject to "forced" busing, others attend racially identifiable schools in their neighborhoods. The truth of these allegations and whether

10

plaintiffs can prove the elements of their legal claims are questions for another day; for purposes of the instant motion, plaintiffs have sufficiently alleged injury in fact.

Defendant argued briefly and without citation in its initial motion to dismiss that because the complaint fails to allege injury in fact, plaintiffs ipso facto fail to satisfy the second and third prongs of the Article III standing test requiring a causal connection to an injury and redressibility of the injury. Defendant does not repeat its arguments regarding these elements in its reply, and as discussed above, plaintiffs have sufficiently alleged injury in fact. In addition, plaintiffs have satisfied the remaining prongs. First, plaintiffs clearly allege that defendant's discriminatory policies and practices caused the injuries they complain of. See Lujan, 504 U.S. 560. Second, plaintiffs seek relief with a substantial likelihood of redressing plaintiffs' injuries, including injunctions against the sale or lease of the closed elementary schools, the exit of any community from the District, and the operation of a racially discriminatory school system. See Dept. of Commerce v. U.S. House of Rep., 525 U.S. 316, 317 (1999). Accordingly, plaintiffs have standing to pursue their claims.

## II. Equal Educational Opportunity Act (Count I)

Count I of plaintiffs' amended complaint alleges that defendant violated § 204(f) of the EEOA, codified at 20 U.S.C. § 1703(f), by failing to provide appropriate and sufficient services for LEP students. Section 204(f) provides: "No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by –

(f) the failure by an education agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f). Section 207 of the EEOA, 20 U.S.C. § 1706, provides that "an individual denied an

equal educational opportunity ... may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate." Intent is not a required element of EEOA claim. Castaneda v. Pickard, 648 F.2d 989, 1007 (5th Cir. 1981).

There is limited case law regarding what is required to state a claim under the § 1703(f) of the EEOA. In support of its iteration of the elements of a § 1703(f), defendant relies on a single decades-old opinion in which a district court in the Eastern District of Michigan instructed the plaintiffs in an EEOA action to include certain allegations in their amended complaint. Martin Luther King Junior Elementary Sch. Children v. Michigan Bd. of Educ., 463 F. Supp. 1027 (E.D. Mich. 1978) (plaintiffs must allege language barriers, how language barriers impeded education, what appropriate actions defendant failed to take, and identify the causal connection). The Michigan court's opinion, however, is not binding on this court, has never been cited by another court, and asks too much of a plaintiff under federal notice pleading, including that a plaintiff allege a solution to a problem he identifies in his complaint. The court therefore respectfully declines to adopt the elements of an EEOA claim set forth in Martin Luther King. Instead, the court looks to the clear language of the statute, which establishes that the elements of § 1703(f) violation: (1) language barriers; (2) defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation in instructional programs.

Defendant argues that plaintiffs have failed to allege that they received inadequate bilingual services to help them master English and participate in the District's educational programs, and that defendant has exceeded the "baseline obligation" to provide bilingual education because it provides system-wide bilingual services. Regarding the latter point,

12

defendant again forgets the instant litigation's current stage, raising factual disputes and citing summary judgment cases such as Castaneda, and preliminary injunction cases, such as Valeria G. v. Wilson, 12 F. Supp. 2d 1007, 1017 (N.D. Cal. 1998), which are inapposite. Regarding the former argument, plaintiffs sufficiently allege that the LEP students face language barriers, that the services provided to address these barriers are deficient, and that LEP students are consequently prevented from enjoying full and equal participation in instructional programs. More specifically, plaintiffs explicitly allege that defendant's "failure to provide adequate LEP services interferes with and impedes LEP students' abilities to overcome language barriers." This express allegation is sufficient to state a claim for inadequate services.

Plaintiffs' amended complaint goes beyond the bare minimum required to state a claim, and contains specific factual allegations regarding their EEOA claim that further support their allegation that LEP students were injured by deficient and discriminatory services. In particular, plaintiffs allege that under the Redistricting Plan: (1) there are diminishing available neighborhood seats for qualifying LEP students and insufficient seats in minority neighborhoods; (2) LEP students ready to transition into regular classes are being held in LEP classes because there are insufficient seats in regular education classes in minority neighborhoods; and (3) LEP students are required to change schools frequently in order to obtain access to LEP services. Plaintiffs also allege that LEP students are: (1) impermissibly segregated from regular education students for all instruction rather than for specific educational subjects and purposes only; (2) LEP students are denied proper access to special education referrals, reviews, and services; and (3) LEP students are not afforded adequate LEP education opportunities. In addition, plaintiffs claim that defendant's own audit by Dr. Arias revealed numerous deficiencies in LEP services,

13

including failures in staff training, disseminating information to staff and parents, and properly assessing students' need for language services.

Defendant's factual arguments against plaintiffs' version of the events invite mini-trials on plaintiffs' allegations in direct contravention of the purpose of a motion to dismiss. However eager defendant is to establish its rectitude, it may not eschew the Federal Rules and case law by supporting its motion to dismiss with summary judgment arguments. See, e.g., Gomez v. Illinois State Board of Educ., 811 F.2d 1030, 1039 (7th Cir. 1987) ("The attack is on the sufficiency of the complaint, and the defendant cannot set or alter the terms of the dispute, but must demonstrate that the plaintiff's claim, as set forth by the complaint, is without legal consequence."). At this stage in the litigation, defendant is not permitted to contradict plaintiffs' factual allegations. Plaintiffs have clearly alleged that they were injured by being impeded in their equal participation in educational opportunities by defendant's failure to take appropriate action to overcome language barriers. Accordingly, plaintiffs have stated a claim under the EEOA.

## III.   Equal protection claims (Counts II and III)

Count II of plaintiffs' amended complaint asserts violations of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and Count III asserts violations of the Equal Protection Clause of the Illinois Constitution. Defendant argues that both of plaintiffs' equal protection claims should be dismissed for failure to state a claim because plaintiffs fail to allege the requisite discriminatory intent.

14

The Equal Protection Clause of the U.S. Constitution provides that "no state...shall deny any person within its jurisdiction the equal protection of law."[5] While courts ordinarily defer to governmental classifications unless they lack rational justification, classifications that burden "discrete and insular minorities" are "inherently suspect" under the Equal Protection Clause and are subject to "strict" judicial scrutiny. See United States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). Race and national original are "suspect" classifications triggering strict scrutiny. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 449 (1985) (classes based on race, alienage, or national origin receive "strict scrutiny"). Facially neutral state action violates the Equal Protection Clause when the action is intended to have a racial effect and does so. Washington v. Davis, 426 U.S. 229, 240-41 (1976). That is, to establish a prima facie case of educational discrimination, a plaintiff must show: (1) racially disparate effects; and (2) discriminatory intent. Keyes v. School Dist. No. 1, Denver, Colorado, et al., 413 U.S. 189, 198 (1973); Johnson v. Bd. of Educ. of Champaign Unit School Dist. #4, 188 F. Supp. 2d 944, 970 (C.D. Ill. 2002).

A.  **Intent**

Throughout its briefs, as discussed above, defendant asks too much of plaintiffs' pleadings, insisting that plaintiffs' explicit allegations are deficient. For example, defendant does not deny that plaintiffs have expressly alleged "discriminatory intent," but nonetheless insists that such a straightforward allegation is insufficient to survive a motion to dismiss. At best,

---

[5]The Seventh Circuit has held that equal protection challenges based on the Illinois Constitution are interpreted under the same standards as Federal equal protection claims. See Smith v. Severn, 129 F.3d 419, 424 n. 3 (7th Cir. 1997). The following discussion refers to the Equal Protection Clause of the Constitution, but applies equally to the Illinois Constitution.

defendant's unsuccessful argument represents a fundamental misunderstanding of federal notice pleading and the standard applied to a motion to dismiss.[6] It is a bedrock principle of federal notice pleading, as codified in the Federal Rules of Civil Procedure, that intent need only be pleaded generally. Fed. R. Civ. P. 9(b). Courts have repeatedly held that general allegations of discriminatory intent are sufficient to survive a motion to dismiss. See, e.g., Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998); Triad Associates, Inc. v. Robinson, 10 F. 3d 492, 497 (7th Cir. 1993); Council 31, AFSCME v. Ward, 978 F. 2d 373, 377 (7th Cir. 1992). Indeed, the Triad court specifically held that on a motion to dismiss a claim under the Equal Protection Clause, "we require no more from plaintiffs' allegations of intent than what would satisfy Rule 8's notice pleading minimum and Rule 9(b)'s requirement that motive and intent be pleaded generally."

Even if more were required to survive a motion to dismiss, which it is not, the amended complaint contains numerous allegations regarding the development of the Redistricting Plan that support plaintiffs' general allegation of intent. For example, in addition to the exclusion of certain demographic data, as discussed above, plaintiffs allege that defendant acquiesced to pressure from non-minority communities when it decided to shut Illinois Park, with a predominantly minority student population, rather than Century Park, with a predominantly white population, which had been recommended for closure in the Demographic Report. See Hodges by Hodges v. Public Bldg. Com'n of Chicago, 864 F. Supp. 1493, 1502 (N.D. Ill. 1994) (allegation that defendant caved to racially discriminatory community pressure supported

---

[6]The court notes that much of plaintiffs' response to the motion to dismiss is concerned with evidence and "highly probative facts," and reads like a response to summary judgment motion. While understandable given the tenor and focus of defendant's motion, this too is premature at this stage in the litigation.

allegation of discriminatory intent). Plaintiffs also allege that defendant's strict neighborhood attendance boundary assignment system, imposed after several schools in minority neighborhoods were closed, evidences an intent to benefit students living in white neighborhoods to the detriment of students living in minority neighborhoods. In addition, the court disagrees with defendant that plaintiffs' intent allegations are contradicted by their allegation that defendant did not consider race in developing its student assignment is unpersuasive. Rather, the allegation that defendant deviated from a general practice of collecting racial data when preparing a redistricting plan, in an attempt to "cover" discriminatory motives, supports plaintiffs' intent allegation.

Plaintiffs have explicitly alleged discriminatory intent, which is sufficient to survive a motion to dismiss on the first prong of an equal protection claim, and the amended complaint contains additional factual allegations in support.

**B.  Racially disparate effects**

Defendant asserts that plaintiffs' amended complaint also fails to allege the second required element of an equal protection claim, racially disparate effects. Again, defendant's argument is premised almost entirely on an unwarranted and narrow reading of plaintiffs' claims. Defendant argues that plaintiffs have failed to sufficiently allege "segregative effects," but virtually ignores plaintiffs' other allegations of racially disparate effects, including undue transportation burdens, insufficient services and educational opportunities for LEP students, and a racially discriminatory redistricting plan.

Both parties' citation of cases involving "segregated" school systems, such as United States v. Yonkers Bd. of Educ., 624 F. Supp. 1276 (S.D.N.Y. 1985), aff'd, 837 F.2d 1181 (2nd

17

1987), and People Who Care v. Rockford Bd. of Educ., 111 F.3d 528 (7th Cir. 1997), are largely inapposite to whether plaintiffs have stated a claim. First, neither case was decided on a motion to dismiss. Second, plaintiffs need not allege segregation as extreme as in People Who Care or Yonkers Board of Education to state an equal protection claim. In Palmer v. Board of Educ. of Community Unit School Dist. 201-U, 46 F.3d 682, 686 (7th Cir. 1995), the Seventh Circuit reversed the dismissal of claims by a class of African-American students and parents alleging discrimination relating to school siting decisions, a discriminatory school assignment system, and transportation burdens. The Palmer court noted that the district court was required to take plaintiffs' perspective of the events on a motion to dismiss, and that "if as the plaintiffs allege the school board has closed a school and adopted assignment rules because of race, then it has violated the Constitution." Like the plaintiffs in Palmer, plaintiffs in the instant case have alleged that they suffered racially disparate effects due to intentional discrimination.

Accordingly, the court denies defendant's motion to dismiss Counts II and III.

## IV.     Illinois Civil Rights Act of 2003 (Count IV)

Under the Illinois Civil Rights Act ("ICRA") no unit of State, county or local government shall "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin." 740 ILCS 23/5(a)(1). The statute does not reference intent. The ICRA applies only to conduct that took place after January 1, 2004, the effective date of the act. Nicol v. Lavin, 2004 WL 1881786, at *7 (N.D. Ill. Aug. 13, 2004).

In the instant case, neither party cites a case defining the elements of a claim under the ICRA, which has been in effect only for a little over a year, and the court is unable to identify

18

such a case. Defendant repeats several of its earlier arguments regarding Counts I through III in favor of dismissal of Count IV, including that plaintiffs fail to allege unlawful discrimination or that the LEP programs are deficient. For the reasons discussed above, these arguments are unpersuasive. Plaintiffs have alleged injuries from the discriminatory effects of defendant's actions after January 1, 2004, the effective date of the statute, which is sufficient to state a claim under the ICRA. Accordingly, defendant's motion to dismiss Count IV is denied.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss the amended complaint is denied.

**ENTER:** **July 25, 2005**

_____
**Robert W. Gettleman**
**United States District Judge**