IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL, DINAH and DEANNA MCFADDEN, minors, by their parent and next friend, Tracy McFadden; KAREN, RODOLFO and KIARA TAPIA, minors, by their parent and next friend, Mariela Montoya; JOCELYN BURCIAGA, minor, by her parent and next friend, Griselda Burciaga; and KASHMIR IVY, minors, by their parent and next friend, Beverly Ivy; KRISTIANNE SIFUENTES, minors, by her parent and next friend, Irma Sifuentes, <br><br> Plaintiffs, <br> v. <br><br> BOARD OF EDUCATION FOR ILLINOIS SCHOOL DISTRICT U-46, <br><br> Defendant. | No. 05 C 0760 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER[1]

After eight years of litigation, 27 days of trial to the bench on the issue of liability, and extensive post-trial briefing, this case boils down to four basic questions:

(1)   Do the named plaintiffs have standing?

---

[1] The court adopts and incorporates the parties' post-trial Stipulation of Uncontested Facts (Doc. 757); which is appended hereto. This opinion constitutes the court's Findings of Fact and Conclusions of Law as required by Fed. R. Civ. P. 52(a)(1). The opinion contains both findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent any Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent that any Conclusions may be deemed findings of fact, they shall also be considered Findings. See Miller v. Fenton, 474 U.S. 104, 113-14 (1985).

(2) Did the 2004 student assignment plan by defendant School District U-46 (the "District") discriminate against Minority Students[2] by concentrating inferior mobile classrooms ("mobiles") at Minority Schools?

(3) Does the English Language Learners ("ELL") program established by the District violate the Equal Education Opportunity Act, 20 U.S.C. § 1701 et. seq.

(4) Does the District's gifted program unlawfully discriminate against Minority Students?

Based on the evidence presented at trial, the court answers these questions:

(1) Yes.

(2) No.

(3) No.

(4) Yes.

The history of this litigation is tangled and protracted, with plaintiffs shifting their claims and emphasis a number of times during the course of discovery and motion practice.[3] Although fact discovery closed in 2009 and expert discovery closed in 2010, the trial of this case was delayed by motions to dismiss, for summary judgment and class certification, as well as numerous pretrial motions, disputes concerning the qualifications of plaintiffs' experts, and disputes occurring during the trial itself.[4] While the court appreciates the difficulties and

---

[2] As used herein, the term "Minority Students" refers to Hispanic and African American students; the term "Minority Schools" refers to schools that have more than 50% Hispanic or African American students.

[3] As the District points out, plaintiffs have dropped a number of claims during the course of this litigation, including issues involving assignments to non-neighborhood schools, transportation, and special education.

[4] The testimonial portion of the trial did not conclude until September 24, 2012, and the final (105 page) post-trial brief was not filed until March 15, 2013. Supplemental authority with
(continued...)

challenges confronted by counsel throughout this case, it is unfortunate that the parents and children affected, not to mention the professional staff of the District, have had to wait so long to have this matter brought to a point of decision.

To avoid prolonging the length of this opinion[5], the court refers to its previous opinions and orders,[6] and will deal with the four issues presented by the trial.

I.  **Standing**

As it has throughout this litigation, the District challenges the named plaintiffs' standing to bring their claims, asserting that none of them have suffered an injury in fact. The court has rejected this argument four times (Docs. 29, 70, 96, 537), and does so again.

To establish standing, plaintiffs must show: (1) injury in fact, meaning an invasion of a legally protectable interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to defendant's actions; and (3) that a favorable decision is likely to redress the injury. Tobin for Governor v. Ill. State Bd. of

---

[4](...continued)
accompanying briefs were filed in June 2013.

[5]This opinion addresses the evidence and issues the court finds to be dispositive on the question of liability. The fact that it does not address every argument and point raised by the parties at trial and in their post-trial submissions should not be taken as an invitation to file yet more briefs or motions to reconsider. This is the court's final word on liability, and the only issues remaining are the remedy for the constitutional and statutory violations in the District's gifted program for elementary schools, and attorney's fees.

[6]McFadden v. Bd. of Ed. for Ill. Sch. Dist. U-46, 2006 WL 681054 (N.D. Ill. Mar. 13, 2006); (Class Certification I). McFadden v. Bd. of Ed. for Ill. Sch. Dist. U-46, 2006 WL 6284486 (N.D. Ill. Oct. 3, 2006) (motion to dismiss second amended complaint). McFadden v. Bd. of Ed. for Ill. Sch. Dist. U-46, 2008 WL 4877150 (N.D. Ill. Aug. 8, 2008); (Class Certification II).

3

Elections, 268 F.3d 517, 527-28 (7th Cir. 2001) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Sierakowski v. Ryan, 223 F.3d 440, 442-43 (7th Cir. 2000)). Abstract injury is not enough to establish injury in fact; the plaintiffs must establish that they have sustained or are immediately in danger of sustaining some direct injury. See City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1993); Tobin, 268 F.3d at 527-28.

In a putative class action, each named plaintiff must allege an injury in fact. See Gratz v. Bollinger, 539 U.S. 244, 289 (2003) (The fact that a "suit may be a 'class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and purport to represent.'") (citations omitted); Payton v. County of Kane, 308 F.3d 673, 682 (7th Cir. 2002) ("Standing cannot be acquired through the backdoor of a class action.") (citing Allee v. Medrano, 416 U.S. 802, 828-29 (1974) (Burger, C.J., dissenting). And, as the District points out, general allegations that suffice to allege standing at earlier stages of the litigation are insufficient to prove standing once a case has gone to trial. At that point, standing must be "supported adequately by the evidence adduced at trial." Lujan, 504 U.S. at 561.

As in its previous motions, the District argues that plaintiffs have failed to establish standing because none of the named plaintiffs have suffered any of the harms that they attempted to establish at trial. Specifically, according to the District, the evidence established that none of the named plaintiffs attended an overcrowded school and, in any event, there was no evidence that the use of mobiles created any harm, leaving plaintiffs without standing to assert their "student assignment" claims. Next, with respect to plaintiffs' challenge to the ELL program, the

4

District argues that no named plaintiffs suffered from any of the asserted program deficiencies, such as forced "early exit." Finally, with respect to the gifted program, the District argues that no named plaintiff participated in any elementary gifted program and thus has no standing to challenge such program. Citing Wiesmueller v. Kosobucki, 571 F.3d 699, 703 (7th Cir. 2009), the District argues that no named plaintiff had even a "realistic chance" of being identified as gifted.

Whether there is any merit to the District's argument depends on whether the named plaintiffs' claims are defined generally or specifically. Their general claims are that U-46 is a discriminatory school district that acts to keep whites and Minority Students separate. The District accomplished this, according to plaintiffs, in many ways, but the net result is that each Minority Student suffered the indignities of segregation and, under Brown v. Bd. of Education, 347 U.S. 483 (1954), each Minority Student in the District would have standing to challenge all of the segregational aspects and actions of the District.

If, as the District argues, plaintiffs' claims should be defined with more specificity, then a variance or disjuncture between the class representatives' claims and those of the class is created.[7] For example (accepting the District's argument), although no named plaintiff was ever

---

[7]The court certified two classes defined as:

(1) All current Hispanic and African-American [District] students who have been subjected to or continue to be subjected to the District's racial discrimination in student assignment and provision of programs and services resulting in instability of student assignments, assignment to non-neighborhood schools, assignment to overcrowded schools, transportation burdens, closure of Illinois Park School, program deficiencies in Limited English Proficiency ("LEP") services, or education deficiencies arising from the above conditions.

(continued...)

5

in a gifted program and could not challenge it, other unnamed members of the class were and could. If this disjuncture is resolved by standing analysis, then plaintiffs might lack standing to bring the "gifted claims." If, on the other hand, this disjuncture is resolved by Fed. R. Civ. P. 23(a) analysis, as some courts have held, then once the court finds that the named plaintiffs have standing to bring any claims, the issue is simply whether under Rule 23 they are proper class representatives to litigate the other members' claims.

How such a variance or disjuncture should be analyzed has not been conclusively resolved. In several cases the Supreme Court has applied a Rule 23 analysis. See Sosna v. Iowa, 419 U.S. 393, 403 (1975); General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982) (Mexican-American plaintiff passed over for promotion had standing to pursue his and class members' claims for race discrimination in promotions but could not represent a class of applicants who were denied jobs in the first instance because the claims did not satisfy Rule 23(a)'s typicality and adequacy requirements).

In other cases, the Court has treated the disjuncture as a standing problem. For example, in Blum v. Yaretsky, 457 U.S. 991, 1001 (1982), decided the same year as Falcon, the Court held that Medicaid patients challenging nursing home decisions to transfer them to a lower level of care did not have standing to represent patients transferred to a higher level of care. Again, in Lewis v. Casey, 518 U.S. 343, 357-60 (1986), the case on which the District principally relies,

---

[7](...continued)
(2) All current Hispanic U-46 students who are receiving LEP services, or who have received LEP services by the District in the past four years, or who should have but did not receive LEP services, and who have been subjected to or continue to be subjected to deficiencies in the District's LEP services in the area of identification, exiting/transitioning, parent information, special education, or assignment to non-neighborhood schools.

6

the Court held that a prisoner alleging a denial of his right to access to the courts based on illiteracy could not represent others allegedly denied access to the courts because they could not speak English or were in lockdown.

> [S]tanding is not dispensed in gross. If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law. [Id. n. 6 (emphasis in original)]

Finally, in Gratz, the Court struck down the University of Michigan's undergraduate race-based affirmative action admissions plan. The named plaintiff was a transfer applicant, but sought to also represent class members challenging the use of race in undergraduate freshman admissions. Addressing the argument raised by the dissent that the named plaintiff lacked standing to represent the additional class, the Court noted (539 U.S. at 262-63):

> [T]here is a question whether the relevance of this variation, if any, is a matter of Article III standing at all or whether it goes to the propriety of class certification pursuant to Federal Rule of Civil Procedure 23(a). The parties have not briefed the question of standing versus adequacy, however, and we need not resolve the question today: Regardless of whether the requirement is deemed one of adequacy or standing, it is clearly satisfied in this case.

Gratz also reiterated the Court's often-expressed view that "the 'injury in fact' in any equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Id at 262.

Although this court is of the view that the disjuncture or variance issue is better addressed as an adequacy issue under Rule 23 once it has been determined that the named plaintiff has standing to bring a claim, it need not reach the issue because, like Gratz, either requirement is clearly satisfied. First, if the alleged harm is defined generally as Hispanic students being denied

7

equal treatment based on their race, then under Brown and Gratz, plaintiffs have standing to challenge all the specific discriminatory policies and actions of the Board. Next, even if the harm asserted is defined specifically as the District insists, plaintiffs still have standing. There are at least three named plaintiffs who have attended schools that used mobiles to alleviate what plaintiffs argue would otherwise result in overcrowding. That gives them standing to challenge the student assignment plan, because these named plaintiffs have suffered concrete injury if the court were to find that the use of mobiles to relieve overcrowding results in inferior educational opportunities or services to Minority Students. With respect to the ELL program, there is no question that there are at least four named plaintiffs who are in the ELL program, and have standing to challenge all of the methods employed as well as the results achieved.

Finally, with respect to the gifted program, although none of the named plaintiffs ever achieved test results that might suggest that they are "gifted," they certainly have standing to challenge the manner by which the District identified gifted students. Specifically, plaintiffs spent a large part of their case establishing that the District's method of identifying gifted students effectively eliminated from consideration many Minority Students simply because the tests used by the District measured achievement based on verbal skills. According to plaintiffs, every Minority Student, particularly Hispanics, were tested under these faulty procedures. Consequently, each has a right to challenge those procedures. It is impossible to turn back the clock to determine whether under proper testing any of the named plaintiffs might have been identified as gifted,[8] but nonetheless each has the right and standing to challenge the procedures

---

[8]The court notes that plaintiff Dinah McFadden was accepted to and attended the Streamwood High School World Language and International Studies Academy, one of the
(continued...)

8

used and, if successful, to force the District to alter those procedures. Accordingly, the court concludes that plaintiffs had standing to bring their claims when the suit was filed and have proved that standing at trial.

## II. The 2004 Student Assignment Plan

Plaintiffs attack the District's 2004 Student Assignment Plan (the "2004 Plan") as violating their rights under the Equal Protection Clauses of the United States and Illinois Constitutions and the Illinois Civil Rights Act, 740 ILCS 23/5(a)(2) ("ICRA"). Their claims are grounded on two propositions: (1) the District intentionally discriminated against Minority Students when it chose to utilize a geographic, neighborhood school model in determining school boundaries; and (2) regardless of intent, the 2004 Plan had a disparate impact on Minority Students by forcing them to attend overcrowded schools that required the use of inferior mobiles to relieve the overcrowding. Although, as plaintiffs recognize, their equal protection claims require proof of both intentional discrimination and discriminatory effect, Chavez v. Ill. State Police, 251 F.3d 612, 635-36 (7th Cir. 2001),[9] plaintiffs' claim under the ICRA requires only a disparate impact regardless of intent, Jackson v. Cerpa, 696 F. Supp.2d 962, 964 (N.D. Ill. 2010) (The ICRA "was expressly intended to provide a state law remedy that was identical to the federal disparate impact canon.") (emphasis in original). Consequently, plaintiffs' attack on the

---

[8](...continued)
District's gifted programs.

[9]The Seventh Circuit has held that equal protection challenges based on the Illinois Constitution should be interpreted under the same standards as federal equal protection claims. See Smith v. Severn, 129 F.3d 419, 424 n.3 (7th Cir. 1997).

9

2004 Plan under either the Fourteenth Amendment or the ICRA requires proof that the mobiles used by the District were inferior to the point of constituting a discriminatory impact.

The court concludes that plaintiffs have failed to meet their burden of proof with respect to their claim that the mobiles used by the District are so inferior as to constitute a discriminatory impact on Minority Students. Plaintiffs' evidence on this issue consisted primarily of the expert testimony of Edward Kazanjian[10] and certain statements by District personnel. It should be noted that the mobile classrooms at issue in this case are not merely trailers that have been converted into academic use. These are large, mobile structures more akin to small prefabricated houses than standard trailers. They are designed and built specifically for classroom use and are actually larger than many interior classrooms. They are ramped for accessability and have full heating, air conditioning and other amenities that are found in regular interior classrooms.

Mr. Kazanjian testified that he had visited all the mobiles in the District and found some of them to be in unsatisfactory condition. To be sure, Mr. Kazanjian did offer evidence that at least a few of the mobiles being used in some of the Minority Schools had problems such as blocked exit doorways and needed repairs to some of the exterior features. Other problems that Mr. Kazanjian identified, such as walls cluttered with the students' artwork and exposed extension cords, could no doubt be found in interior classrooms as well as the mobiles he choose to select for presentation to the court. Indeed, Mr. Kazanjian appears to have "cherry picked" some of the worst mobiles that he found and avoided testifying about those that he found in good condition.

---

[10]Mr. Kazanjian, a registered school business administrator, was offered by plaintiffs as an expert on the physical condition and viability of the District's facilities and mobiles.

10

As the District points out, without a comparison between the condition of the mobiles and the condition of the interior classrooms, it is impossible for the court to find that the mobiles that were being used by the District were so inherently inferior as to constitute a disparate impact by themselves. Although certain features of mobile classrooms are no doubt undesirable as compared to interior classrooms, other features are arguably improvements over their interior counterparts. For example, each mobile has a water cooler inside the classroom, something that is not found in interior classrooms. In addition, mobiles are larger than some interior classrooms. Although students are inconvenienced by having to go outside to use the restroom in the adjacent buildings during bad weather, during good weather they benefit by getting some fresh air. Although plaintiffs claim that the students were put in danger by being allowed to go outside to the main building to use the restrooms, they presented no evidence to show that any student was in fact jeopardized or endangered while he or she was walking the short distance to and from the mobiles and the main buildings.

Equally important, the District's evidence established that mobiles are used throughout the country, and with respect to District U-46 mobiles are not used unless requested by the principal of the particular school, approved by a Board committee and the Board itself, and then approved by the Illinois State Board of Education's Regional Office of Education ("ROE"). Indeed, the ROE inspects all mobiles annually, as does the District's own architect, and must approve all mobiles for use. The District's expert credibly testified that all of the mobiles he inspected were below the industry standard of recommended age (20 years) and, with two exceptions, were at or above the recommended conditions in the industry.

Plaintiffs also rely on other evidence to support their claim that mobiles are inherently inferior. Plaintiffs have offered evidence that shows that the District generally regarded mobiles as an undesirable but necessary means to relieve overcrowding. The court agrees with plaintiffs that some of defendants' witnesses (called as adverse witnesses by plaintiffs) were less than forthcoming in describing their preference for avoiding the use of mobiles. These witnesses also explained, however, that the reasons for minimizing the use of mobiles included more than the quality of the mobiles themselves. Mobiles incur added costs and maintenance to the District, as well as additional administrative expenses involved in obtaining ROE approval.

Based upon its review of the extensive record developed concerning this issue, the court concludes that, although mobiles may not be an ideal situation for the children attending classes in them, they are not so inferior as to constitute a sufficient adverse impact that their use alone would result in a discriminatory action by the District against Minority Students. This conclusion defeats plaintiffs' claims under the Equal Protection Clauses of the United States and Illinois Constitutions, Chavez, 251 F.3d at 635-36, as well as the ICRA, Jackson, 696 F. Supp. 2d at 964.

Even had the court concluded that mobiles were inferior, plaintiffs would be required to show intentional discrimination in their use and placement by the District to sustain their equal protection claims. Because this matter was hotly contested at trial, and colors plaintiffs' entire case regarding the 2004 Plan, the court will briefly address the issue. Plaintiffs' evidence does

demonstrate that after the 2004 Plan was put into effect all but one group of four mobiles were used in the Minority Schools.[11]

The context in which the decisions to place mobiles were made is important in analyzing whether the District had a discriminatory purpose. After experiencing a dramatic increase in population, the District passed a bond issue in 2000 that allowed it to build six new schools. Prior to the 2004 Plan, the District, like many districts in the country, assigned students to schools where space was available, resulting in what the District termed "satellite" or "pocket" attendance zones in which students were assigned to schools to which they were not geographically connected. Thus, one purpose of the 2004 Plan was to eliminate these satellite zones so that children could attend schools closer to their homes.

After building the first three schools, the District faced an unexpected $40 million deficit (more than 10% of its budget) and consequently was forced to examine the attendance boundaries within the District and the challenge of accommodating an increasing student population within its means. In addition to its professional staff, the District hired a consultant, Dr. Jerome McKibben, a demographer with extensive experience in enrollment forecasts and school attendance boundaries, to help develop a plan to redistrict that eventually became the 2004 Plan. Dr. McKibben was given the Board's goals of eliminating satellite zones, creating contiguous, compact attendance areas with centrally located schools, and respecting natural boundaries. He was not instructed to consider programmatic factors in determining and

---

[11]The parties dispute whether Nature Ridge School (where the four mobiles mentioned above were located) should be categorized as a white or a Minority School. Plaintiffs claim that the ratio of white to Minority Students was 50/50, according to the 2009 ISBE report card, while defendant claims Nature Ridge was more than 50% white. The resolution of this disagreement is immaterial to the court's analysis.

13

recommending the attendance boundaries, an omission that plaintiffs claim evidences a discriminatory intent.

Needless to say, any decision to change school attendance boundaries is bound to provoke public concern.[12] Adopting the concept of neighborhood schools when impartially maintained and administered does not, by itself, indicate a discriminatory purpose by the District's Board. See Bd. of Ed. of Oklahoma City Pub. Schools v Dowell, 375 F.2d 158, 166 (10th Cir. 1967). This is true even if the impact of the decision "bears more heavily on one race than another." See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977). Impact alone is not determinative of invidious discriminatory purpose. If the decision impacts one race over another, the court looks to other evidence such as the historical background of the decision, the sequence of events leading up to the decision, and the legislative or administrative history of the decision. Id. at 267.

Plaintiffs contend that the District's adoption of a neighborhood school concept was a pretext for intentional discrimination. In addition to the instructions given to Dr. McKibben, plaintiffs cite certain statements made by District superintendent Dr. Connie Neale and Board President Karen Carney, as well as an alleged deviation from District guidelines. With respect to the comments by Dr. Neal and Ms. Carney, although a great deal of time was spent at trial and a great deal of space was spent in the briefing by the parties concerning this evidence, the court finds nothing in the comments to indicate that race or ethnicity was a factor in drawing the attendance boundaries embodied in the 2004 Plan. Quite the contrary, both Dr. Neal and Ms.

---

[12]The court and the parties are no doubt mindful of the recent heated controversies engendered by the Chicago Board of Education's decision to close a number of schools in Chicago, with the necessity of redrawing school attendance boundaries.

Carney disavowed the use of race in the 2004 Plan, and merely commented that going forward the District should not use Minority Students as a "desegregation program" in which those students were bused to schools outside their geographic area. As Dr. McKibben credibly testified, reducing the amount of busing within a large district like U-46 is a desirable result in determining attendance boundaries. These same considerations were part and parcel of the District's guidelines that existed before the 2004 Plan was constructed.

Plaintiffs also strenuously argue that the District should not have implemented the 2004 Plan over the vociferous objections of some of the population, the same population that had historically objected to excessive busing. Again, the redrawing of school boundaries often provokes opposition, which the District should (and in this case did) consider in making final decisions. Those decisions, however, are difficult educational judgments with which the court should not interfere absent proof of discriminatory intent – proof that is lacking in this case.

It is clear to the court, considering all of the evidence and the extensive testimony presented at the trial, that the professional staff of the District, including its superintendent and board, were dealing with an increasing population generally, an increasing number of students who required special language support, a budgetary crisis, and an active, involved community. Regardless of the decisions ultimately made by the District, some portion of the population would be unhappy. The ultimate decision to adopt a neighborhood school concept that minimized busing and allowed children to attend schools nearer to their homes was not objectively unreasonable, nor in this court's opinion caused by any racial animus or preference by the District.